**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

H.M. NABAVIAN & SONS, INC.,

          Plaintiff,

       v.

UNITED STATES OF AMERICA,

          Defendant.

Case No. 1:26-cv-00414

Judge Eleni M. Roumel

**PLAINTIFF H.M. NABAVIAN & SONS, INC.'S**
**MEMORANDUM IN OPPOSITION TO THE**
**<u>UNITED STATES' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

INTRODUCTION...................................................................................................................... 1

QUESTIONS PRESENTED ..................................................................................................... 5

FACTUAL BACKGROUND .................................................................................................... 5

    I.     IEEPA Tariffs and *Learning Resources* ................................................................... 5

    II.    Flow of Duties Through Collection Conduits................................................................ 6

    III.    The Proposed Class of Tariffed Payors .......................................................... 7

    IV.    CBP's Refund Infrastructure.................................................................................... 8

    V.    Proceedings Before the CIT .................................................................................... 10

ARGUMENT............................................................................................................................ 12

    I.     Legal Standard .......................................................................................................... 13

    II.    Plaintiff pleads facts establishing Tucker Act jurisdiction. ................................. 14

        A.    Section 1491(c) does not displace Tucker Act jurisdiction over Plaintiff's illegal-exaction claim. .......................................................................................................... 15

        B.    The CIT's jurisdictional statute and related customs statutes do not authorize any remedy for Plaintiff's claim. ..................................................................................... 16

        C.    The absence of a CIT remedy creates a jurisdictional gap that, under *Trayco*, the Tucker Act must fill. ................................................................................................. 18

        D. The Government's authorities do not support its channeling theory. ............................. 20

    III.    The Complaint plausibly alleges both standing under Article III of the United States Constitution and an illegal exaction.......................................................................... 24

        A.    Plaintiff has adequately alleged Article III standing.................................................... 24

        B.    The Complaint plausibly alleges an illegal exaction. .................................................. 26

            1.    Importers of record act as collection conduits for the Government.......................... 27

            2.    The importers' pass-through was compelled by the Government's design, not an independent business decision. ..................................................................................... 28

            3.    The tariffed payors, not the importers, are the real parties in interest and the only ones positioned to vindicate the wrong.......................................................................... 31

CONCLUSION ........................................................................................................................ 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerolineas Argentinas v. United States*,
  77 F.3d 1564 (Fed. Cir. 1996) ................................................................... 26, 27, 30

*AGS Co. Auto. Sols. v. U.S. Customs & Border Prot.*,
  813 F. Supp. 3d 1298 (Ct. Int'l Trade 2025) ........................................................ 10

*Am. Bankers Ass'n v. United States*,
  932 F.3d 1375 (Fed. Cir. 2019) ........................................................................... 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 14

*Boeing Co. v. United States*,
  968 F.3d 1371 (Fed. Cir. 2020) ..................................................................... 14, 15

*BP Am. Prod. Co. v. United States*,
  142 Fed. Cl. 446 (2019).......................................................................................... 19

*Camellia Apartments, Inc. v. United States*,
  167 Ct. Cl. 224 (1964)........................................................................................... 26

*Clapp v. United States*,
  127 Ct. Cl. 505 (1954)............................................................................... 7, 26, 30

*Cyprus Amax Coal Co. v. United States*,
  205 F.3d 1369 (Fed. Cir. 2000) ........................................................................... 19

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ............................................................................................. 25

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*,
  606 U.S. 100 (2025) ............................................................................................. 25

*Dinh v. United States*,
  145 F.4th 1316 (Fed. Cir. 2025)........................................................................... 19

*Eastport S.S. Corp. v. United States*,
  372 F.2d 1002 (Ct. Cl. 1967)..................................................................... 14, 15, 26

*Estes Exp. Lines v. United States*,
  739 F.3d 689 (Fed. Cir. 2014) ...................................................................... 13

*Fireman v. United States*,
  44 Fed. Cl. 528 (1999) ........................................................................... 28, 31

*Forest Products Northwest, Inc. v. United States*,
  453 F.3d 1355 (Fed. Cir. 2006) .............................................................. 20, 21

*Hartford Fire Ins. Co. v. United States*,
  544 F.3d 1289 (Fed. Cir. 2008) .............................................................. 16, 17

*Juancheng Kangtai Chem. Co. v. United States*,
  932 F.3d 1321 (Fed. Cir. 2019) ...................................................................... 17

*K-mart Corp. v. Cartier, Inc.*,
  485 U.S. 176 (1988) ......................................................................................... 18

*Learning Resources, Inc. v. Trump*,
  607 U.S. 229 (2026) ................................................................................. *passim*

*Lesko v. United States*,
  166 F.4th 967 (Fed. Cir. 2026) ....................................................................... 29

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................. 14, 24

*Management and Training Corp. v. United States*,
  115 Fed. Cl. 26 (2014) ..................................................................................... 25

*McLaughlin Chiropractic Assocs. v. McKesson Corp.*,
  606 U.S. 146 (2025) ......................................................................................... 19

*Mitsubishi Elecs. Am., Inc. v. United States*,
  44 F.3d 973 (Fed. Cir. 1994) .......................................................................... 17

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ..................................................................................... 24, 26

*Nichols v. United States*,
  74 U.S. 122 (1869) ........................................................................................... 23

*Pan American World Airways v. United States*,
  122 F. Supp. 682 (Ct. Cl. 1954) ..................................................................... 31

*Polinski v. United States*,
178 Fed. Cl. 736 (2025)............................................................................................. 13, 14

*RadioShack Corp. v. United States*,
566 F.3d 1358 (Fed. Cir. 2009) ....................................................................................... 13

*Reynolds v. Army & Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988) ........................................................................................ 14

*Rimco Inc. v. United States*,
98 F.4th 1046 (Fed. Cir. 2024) ....................................................................................... 17

*S. African Marine Corp. v. United States*,
640 F. Supp. 247 (Ct. Int'l Trade 1986) ........................................................................ 17

*Sw. Airlines Co. v. United States*,
777 F. Supp. 3d 1318 (Ct. Int'l Trade 2025) ................................................................. 28

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ....................................................................................................... 14

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................................................................................................... 24

*Trayco, Inc. v. United States*,
994 F.2d 832 (Fed. Cir. 1993) .................................................................................. 15, 18

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ....................................................................................................... 11

*United States v. Bormes*,
568 U.S. 6 (2012) ..................................................................................................... *passim*

*United States v. Kaufman*,
96 U.S. 567 (1878) ......................................................................................................... 23

*United States v. Texas*,
599 U.S. 670 (2023) ....................................................................................................... 25

*Virgin Islands Port Auth. v. United States*,
136 Fed. Cl. 7 (2018), *aff'd on other grounds*, 922 F.3d 1328 (Fed. Cir. 2019)........... 27, 28, 31

*Wagstaff v. United States*,
105 Fed. Cl. 99 (2012).................................................................................................... 19

**Statutes**

19 U.S.C. § 1514......................................................................................................... 16, 17

28 U.S.C. § 1491......................................................................................................... 14, 15

28 U.S.C. § 1581.............................................................................................................. 16

**Regulations**

19 C.F.R. § 141.1 ....................................................................................................... 28, 30

**Other Authorities**

H.R. Rep. 96-1235 (1980), 1980 U.S.C.C.A.N. 3729. .......................................................... 21, 22

## **INTRODUCTION**

Plaintiff seeks to represent a Class of similarly situated payors, whose money—totaling tens of billions of dollars—currently sits in the pocket of the United States Government. Members of this proposed Class paid the Government money that the Government had no lawful right to exact, and they now seek to recover it. This case arises from an unprecedented situation and presents a simple question to this Court: when the Government exacts money through tariffs later held illegal, and the end payors of those tariffs have no remedial pathway in the Court of International Trade, may *any* federal court hear their claims and order the Government to return their money? The answer must be "yes."

But the Government's motion to dismiss insists that the answer is "no," based on a simple syllogism. *First*, it asserts that all International Emergency Economic Powers Act ("IEEPA") tariff refund disputes "arise out of" tariff laws and therefore fall within the Court of International Trade's ("CIT") exclusive jurisdiction under 28 U.S.C. § 1581. *Second*, the Government reasons that because the CIT has exclusive jurisdiction over any such tariff-refund "matter," 28 U.S.C. § 1491(c) strips this Court of Tucker Act jurisdiction. *Third*, the Government then concludes that Plaintiff and the proposed Class cannot seek relief from this Court, because to do so would invent "a new category of illegal exaction claim" for "tariff surcharges." *See* ECF No. 18, Defendant's Motion to Dismiss ("Mot.") at 16.

The Government's position cannot be the law. Plaintiff and the proposed Class of tariffed payors have no path to relief in the CIT. They have no protest rights under 19 U.S.C. § 1514, because Customs and Border Protection ("CBP") assessed duties only against importers of record and their sureties. They cannot invoke the CIT's residual jurisdiction under 28 U.S.C. § 1581(i), because that provision presupposes an underlying customs relationship to administer or enforce,

1

which is absent here. Nor can Plaintiff and the proposed Class access CBP's administrative refund tool because that tool is keyed to importer-of-record entry data and credentials, not to tariffed payors whose names appear only on invoices. The core premise of the Government's motion—that adequate relief for Plaintiff and the proposed Class is available at the CIT—is therefore wrong. The "precise remedial scheme" that Congress crafted for duty refunds never opened the CIT's doors to these plaintiffs.

If the Government's position were accepted, it would deprive Plaintiff and the proposed Class of a forum and open a vast remedial gap in the IEEPA-duty refund scheme. Fortunately, where customs statutes are silent, the Tucker Act applies. This Court has long had jurisdiction under 28 U.S.C. § 1491(a)(1) over illegal exactions—money paid directly or in effect to the Government that it holds without lawful authority. Plaintiff's theory of recovery is a straightforward, well-pleaded claim of illegal exaction. Whatever label the Government may try to attach to Plaintiff's theory, Plaintiff and the proposed Class demand recovery only of specific sums of money they paid the Government to satisfy an obligation that the Supreme Court has declared was unlawfully imposed.

The journey that Plaintiff's and the proposed class's money has taken from their pockets to the United States Treasury is not a mystery. CBP required importers of record to deposit IEEPA duties as a condition of entry. Under threat of liability, facing crushing economic pressure, and describing themselves as collection conduits for the Government, the importers passed those duty charges on to Plaintiff and members of the proposed Class, on a dollar-for-dollar basis, as discrete duty-specific line items. This Court has long recognized that an exaction can be "paid in effect" through intermediaries acting as collection conduits—even without explicit Government coercion—so long as the plaintiff's funds ultimately satisfy an unlawful governmental demand

2

and make their way to the United States Treasury. In this light, Plaintiff's theory of liability is not "a new category of illegal exaction claim," as the Government suggests, but an application of the longstanding "paid in effect" standard for illegal exactions to an unprecedented factual setting.

The Government recognizes that its position would leave hundreds of thousands of concretely injured Class members without a forum to plead their case. Anticipating the jurisdictional gap that its argument would create, the Government gestures to the class actions now pending in the CIT, as if they might deliver what the customs statutes withhold. They will not. Whatever those cases secure for importers of record, they cannot secure relief for the proposed Class here. The customs statutes provide for a "refund" of duties only to the importer of record (or its surety). That entitlement runs through protests under 19 U.S.C. § 1514 and actions under 28 U.S.C. § 1581 challenging CBP's implementation of *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026) ("*Learning Resources*") and related orders. At each turn, the customs statutes impose an insurmountable jurisdictional obstacle on Plaintiff and the proposed Class. Tariffed payors filed no entries, hold no protest rights, and therefore have no grounds to invoke the CIT's jurisdiction. The Government's representatives have acknowledged as much without mincing words. Treasury Secretary Scott Bessent labeled the IEEPA refund process as "the ultimate corporate welfare" for importers, with "the American people" unlikely to see a dime. Compl. ¶ 36.

Nor would proceeding with a multiplicity of lawsuits seeking refunds of refunds from importers of record be an appropriate remedy or a worthwhile use of judicial resources. Those cases would proceed under the contract and unjust-enrichment laws of all fifty states, with no single federal standard to govern them and no assurance of recovery anywhere. Such "refund-of-refund" litigation—which would be made necessary only because the Government returned unconstitutional exactions to parties that did not bear the loss—would require courts to

3

reconstruct, through the intricacies of state common law, a federal refund that the Government already concedes is owed. That is not how a federal Government should return money it unlawfully exacted from citizens, and it is not how the judicial system should adjudicate the claims of a proposed Class.

The better path—one that both the law and equity compel—runs directly through the well-established jurisdiction of this Court. By hearing Plaintiff's claim, this Court will be working conjointly with the CIT. In a single proceeding, this Court can determine the Government's liability to a carefully defined Class of tariffed payors. It can do so without risk of double payment. With modest coordination, such as certifying to the CIT the passed-through portions of any IEEPA refund and reserving those amounts for the tariffed payors who bore them, the Government can pay each dollar once, to the true party from whom that dollar was unlawfully exacted. And because the central question now is *how* the money is returned, this Court can appoint a special master to administer distribution once the Class establishes that it bore the exaction. The result is order instead of duplication and potential chaos: A Tucker Act action in this Court, proceeding simultaneously with—but not displacing—the CIT's ongoing work for importers, so that each dollar of an unlawful exaction reaches only the party that bore it.[1]

This Court should not permit the Government to narrow the scope of the Tucker Act or this Court's authority to assume jurisdiction over claims for money damages against the United States. Hundreds of thousands of families and businesses make up Plaintiff's proposed Class, and the

---

[1] It is notable that the Government does not challenge the proposed Class's illegal exaction claims under the Little Tucker Act, which are subject to the concurrent jurisdiction of this Court and any federal district court under 28 U.S.C. § 1346(a). The Government's jurisdictional challenge is made only as to this Court's jurisdiction under 28 U.S.C. § 1491(c), which covers only Tucker Act claims brought under 28 U.S.C. § 1491(a)(1). In any event, as discussed below, Plaintiff establishes that this Court has subject matter jurisdiction over its illegal exaction claim, irrespective of whether it would proceed under Section 1491 or Section 1346.

money rightfully owed to them can be recovered under the Tucker Act. The Government does not deny that it holds the Class's money in its pocket, and that the money was obtained without legal basis. But the Government nevertheless argues that this Court cannot give that money back to the Class, and that no other court will either. The law does not compel that result, and equity should not countenance it. The motion to dismiss should be denied.

## QUESTIONS PRESENTED

(1) 28 U.S.C. §1491(c) withdraws this Court's Tucker Act jurisdiction only over claims that fall within the exclusive jurisdiction of the CIT. The customs refund scheme accommodates importers of record with protest rights but gives the tariffed payors who make up the proposed Class no statutory basis for relief at all in the CIT. Does the Tucker Act fill this jurisdictional gap and provide a remedial forum for their illegal-exaction claim?

(2) Article III standing requires a concrete, particularized injury fairly traceable to the challenged Government conduct and likely to be redressed by a favorable decision. Plaintiff and the proposed Class paid discrete, IEEPA-denominated charges that are traceable to the Government's unlawful demand, and which were then remitted to the Treasury. This Court has jurisdiction to order that money returned under the Tucker Act. Do they have standing to pursue those refunds under Article III?

(3) An illegal exaction lies when the United States holds money paid to it, directly or in effect, that it has no legal right to keep. The Supreme Court has held that the IEEPA tariffs are unlawful. The complaint alleges that the Class paid the exact duties, itemized on commercial invoices and remitted to CBP by importers acting as collection conduits. Do those allegations plausibly state an illegal exaction?

## FACTUAL BACKGROUND

### I.   IEEPA Tariffs and *Learning Resources*

Beginning in February 2025, the President invoked IEEPA to impose tariff duties on a broad range of imported goods through a series of executive orders. Compl. ¶¶ 1, 16–17. CBP collected those duties in connection with the affected shipments and treated them as money owed to the United States. *Id*. ¶¶ 21, 26. Relying on figures from the Congressional Budget Office, the

complaint alleges the unlawful IEEPA tariffs resulted in the collection of approximately $170 billion or more. *Id*. ¶¶ 3, 20, 41.

On February 20, 2026, the Supreme Court in *Learning Resources* held that IEEPA conferred no authority to impose tariffs and invalidated the IEEPA duties. Compl. ¶¶ 2, 19. That ruling established that the duties had been unlawfully exacted and set in motion the obligation to unwind and return them. The legal question that had divided the lower courts—whether the tariffs were lawful—was resolved. What remained was the practical question of returning a sum certain, and to whom.

## II. Flow of Duties Through Collection Conduits

The complaint alleges that payment of the IEEPA duties occurred in two principal ways. Some tariffed payors paid the duties directly to CBP agents at ports of entry or upon delivery. Compl. ¶ 26(a). Others—the members of the Class that this opposition addresses—paid the duties through "discrete, identifiable charges, which were billed on invoices, collected by importers and couriers, and then remitted by those importers and couriers to CBP." *Id.* ¶ 26(b). On that route, the collecting intermediaries were "importers of record and international couriers"—including FedEx, DHL, and UPS—that assessed and collected the IEEPA tariffs in connection with shipments and remitted them to CBP. *Id.* ¶¶ 13, 27.

Under that arrangement, the complaint alleges that the importers of record and couriers "served as third-party collection conduits between tariffed payors . . . and the United States." *Id.* ¶ 27. They "bore none of the economic burden of the duty payments and suffered no concrete injury from collecting those payments . . . and remitting them to CBP." *Id.* Because they "assessed and collected IEEPA-denominated charges as separate line items and remitted those amounts as IEEPA duties," they "acted as conduits through which the United States illegally exacted money

6

from Plaintiff and the Class." *Id.* ¶ 30. The money that the Class paid did not remain with the importer or courier as the price of a good or a service; instead, it was paid out in satisfaction of the Government's duty demand, and the Government holds it now. *Id.* ¶ 31 (alleging that, in economic substance, "the Government has [the Class's] money in its pocket") (quoting *Clapp v. United States*, 127 Ct. Cl. 505, 512 (1954) ("*Clapp*")).

The intermediaries describe their role in the same terms. For example, FedEx explains that "[a]s a transportation provider and customs broker, FedEx is required to assess and collect duties and taxes in accordance with current customs regulations and government directives at the time of import." Compl. ¶ 28. Thus, FedEx "collects tariff and duty amounts from customers and transmits those amounts to CBP in satisfaction of the Government's demand." *Id.* In short, the courier is the collector; the Government is the recipient; and critically, the tariffed payor is the source of the money and the bearer of its loss.

The complaint illustrates this route with a concrete example. It alleges that DHL typically sends a tariffed payor a bill for customs duty payments that the recipient must then pay. *Id.* ¶ 29. One DHL customer was billed a $67 IEEPA tariff on a $345 pendant purchased from a Japanese seller on eBay—an amount that the customer paid to DHL, which remitted it to CBP. That customer dealt with no CBP agent, had no role in the entry, and paid the Government's duty only through the courier that billed it—yet, as the complaint notes, Government representatives have suggested such a buyer "may well get nothing." *Id.* ¶ 29.

## III. The Proposed Class of Tariffed Payors

The proposed Class of "tariffed payors" is defined to include United States citizens and corporations who paid IEEPA tariffs in either of two ways: (a) directly to CBP at a United States port of entry; or (b) to importers of record and couriers, in the form of discrete, identifiable charges

that those intermediaries assessed and collected on the Government's behalf and remitted to CBP. Compl. ¶¶ 3–4, 44. The pleaded Class already excludes any entity that has filed, will file, or will be viewed as filing its own IEEPA claim in the CIT, as well as consumers whose only injury is a higher retail price. *Id.* ¶ 44.[2] Plaintiff and the proposed Class do not seek recovery on behalf of people whose only injury was paying higher retail prices or incurring other indirect economic harms from the tariffs, and the proposed Class definition explicitly excludes them. *Id.* ¶ 44.

## IV. CBP's Refund Infrastructure

After *Learning Resources*, CBP established a centralized administrative process for returning IEEPA duties, administered through its existing entry system. The process is keyed to customs entry data and importer-of-record identifiers: only the importer of record or the licensed customs broker that filed the entry may initiate a refund, and CBP issues the refund only to the importer of record or a recipient whom the importer designates. CBP does not evaluate the private invoicing or pass-through arrangements between importers, couriers, and their customers, and it does not pay refunds to the downstream businesses and individuals who reimbursed the duties as charges on those invoices. *See* IEEPA Duty Refunds, available at U.S. Customs and Border Protection, *International Emergency Economic Powers Act (IEEPA) Duty Refunds*, https://www.cbp.gov/trade/programs-administration/trade-remedies/ieepa-duty-refunds    (last visited July 2, 2026).

---

[2] The proposed class as defined here does not include persons who paid IEEPA duties directly to CBP at a port of entry. To the extent that this Court deems the class definition to encompass such direct-payment claims, Plaintiff does not contest that those claims fall within the CIT's jurisdiction and respectfully submits that they should be transferred to that court under 28 U.S.C. § 1631 rather than dismissed. The claims that remain, and which Plaintiff presses here, are those of the tariffed payors who paid the duties "in effect" through importers of record and couriers and who have no access to the CIT.

The consequence is an asymmetry at the center of this class action. The importer of record who deposited the duty can recover the unlawful IEEPA tariff, and so can the courier that collected and advanced it. But the tariffed payor who actually bore the duty—who reimbursed it on an invoice and never dealt with CBP—has no way of initiating a refund and no way to receive one. Compl. ¶¶ 24, 27, 30. The refund machinery returns the money to the parties who passed the cost through, not to the party who paid it.

The Government has acknowledged that result. Before the Supreme Court ruled, the Government assured the CIT that if the tariffs were ruled unlawful, it would not oppose reliquidation and would refund the duties. Compl. ¶¶ 32–34. Since the ruling, Department of Treasury Secretary Scott Bessent—the official responsible for disbursing IEEPA refunds—has described the repayment as "the ultimate corporate welfare" that would flow to importers, and he said that he had "a feeling the American people won't see it." *Id.* ¶ 36.

The remedial gap is not lost on other branches of government. In his dissent in *Learning Resources*, Justice Kavanaugh observed that the United States "may be required to refund billions of dollars to importers who paid the IEEPA tariffs, even though some importers may have already passed on costs to consumers or others." 607 U.S. 229, 334 (Kavanaugh, J., dissenting) (citing statement at oral argument that "the refund process is likely to be a 'mess'"). And a coalition of state officials has pressed the same concern, urging that any refund regime needs to account for the costs to small businesses and consumers, and that American consumers be included in reimbursements rather than be left out. *See* Coalition Letter of State Attorneys General on IEEPA Tariff Refunds, Mar. 18, 2026, https://ago.vermont.gov/sites/ago/files/2026-03/OAG-Tariff-Letter.pdf.

The Government's own positions on this question have not been consistent: it cannot credibly assure one forum that payors will be made whole while describing that same relief, in Secretary Bessent's words, as "corporate welfare" that the American people will never see. Compl. ¶¶ 35–38. The Class cannot safely be relegated to a remedial process the Government itself has undercut.

## V.  Proceedings Before the CIT

The importers of record have a forum. Companies that imported goods and bore IEEPA tariffs have filed claims in the CIT, and the Government assured that court, repeatedly, that if the tariffs were held unlawful, the Government would not oppose reliquidation and would refund the duties. Compl. ¶¶ 32–34 (citing *AGS Co. Auto. Sols. v. U.S. Customs & Border Prot.*, 813 F. Supp. 3d 1298, 1300 (Ct. Int'l Trade 2025)). Following *Learning Resources*, the CIT entered orders directing CBP to remove and refund the IEEPA duties, and CBP built its administrative process to implement them. Order, *Atmus Filtration, Inc. v. United States*, No. 1:26-cv-01259-RKE ("*Atmus*") (Ct. Int'l Trade Mar. 4, 2026), ECF No. 21; Order, *Atmus* (Ct. Int'l Trade Mar. 6, 2026), ECF No. 33; Order, *Atmus* (Ct. Int'l Trade Mar. 6, 2026), ECF No. 34; Order, *Atmus* (Ct. Int'l Trade Mar. 20, 2026), ECF No. 49.

But that forum and those commitments are constrained by importer-of-record status at every turn. The cases before the CIT were brought by and for importers; the Government's assurances ran to importers; and the administrative process pays importers. Compl., *Freestyle World, Inc. v. U.S. Customs and Border Protection*, Case No. 26-cv-01088 (Ct. Int'l Trade Feb. 19, 2026), ECF No. 4; *Harbourview Prods. Int'l v. United Parcel Serv., Inc.*, Case No. 26-cv-01471 (Ct. Int'l Trade Mar. 5, 2026), ECF No. 2. None of it reaches a tariffed payor who filed no entry. The proposed Class here is defined to occupy the gap that those proceedings cannot fill: it

10

excludes any entity that has filed, will file, or will be viewed as filing its own IEEPA claim in the CIT, and it includes only the tariffed payors whom neither the CIT cases nor the administrative refund process reaches. Compl. ¶¶ 8, 44.

The Government's own conduct in the CIT proceedings reveals how limited even importer relief has become. In a motion filed on May 29, 2026, in the *V.O.S. Selections, Inc. v. Trump* litigation, the United States Department of Justice ("DOJ") set out its three-category analysis of the IEEPA refund landscape. For entries that are unliquidated or non-final, the Government acknowledged that CBP is "already in the process of refunding approximately $85 billion of these tariffs—over half the total amount of IEEPA tariffs paid." Defs.' Mot. to Amend Order at 1, *V.O.S. Selections, Inc. v. Trump*, No. 25-00066 (Ct. Int'l Trade May 29, 2026), ECF No. 88 ("*V.O.S. Selections*"). For entries that have finally liquidated and are tied to pending CIT cases, DOJ maintains that "CBP has no authority to reliquidate or refund money without a court order" and that refunds must await importer-specific reliquidation orders. *Id.* at 3. With respect to finally liquidated entries of importers who have not filed CIT cases, DOJ argues that the CIT's universal injunction covering those non-litigants "exceeds the Court's jurisdiction and equitable authority under *Trump v. CASA, Inc.*, 606 U.S. 831, 839 (2025)," and stated its intent to "appeal the Court's universal injunction and to seek a stay of the injunction except as to the particular importer plaintiffs in each case in which the Court has entered the injunction." *Id.* On DOJ's reading, non-litigant importers with finally liquidated entries cannot recover unless they file their own CIT cases and obtain individual court orders. The tariffed payors in the proposed Class, who are not importers and have no statutory entitlement to file in the CIT at all, face a gap that DOJ's three-category framework does not narrow but instead makes explicit.

11

There is a deeper structural problem as well. An importer who collected IEEPA duties from a proposed Class member and remitted them to CBP has, on the complaint's allegations, already been made economically whole; the Class member reimbursed the duty as a discrete charge on its invoice. Compl. ¶¶ 13, 26–27. Any CIT-ordered refund would return those dollars to the importer, not to the Class member who bore the cost. An importer already compensated by its customers has no economic stake of its own, other than an undeserved potential windfall, in pursuing the refund; and if the importer does pursue a refund, no customs mechanism requires it to pass any of those dollars back to the Class. In other words, the party positioned to file in the CIT is not the party that lost the money.

The Administration's public signals compound this problem. On April 21, 2026, the same day that CBP opened its Consolidated Administration And Processing of Entries program ("CAPE") portal for refund claims, President Trump appeared on CNBC's "Squawk Box" and said that he would "remember" companies that forgo tariff refunds, calling such companies "brilliant" and implying that forbearance would be viewed favorably by the Administration. Dan Mangan and Gabrielle Fonrouge, *Trump Favors Companies That Don't Seek Tariff Refund*, CNBC (Apr. 21, 2026), https://www.cnbc.com/2026/04/21/trump-says-hell-remember-companies-that-dont-seek-tariff-refund.html. Those importers now have a political reason to decline participation altogether.

## ARGUMENT

This case presents an issue of first impression: whether any federal court may grant relief to a non-importer who bore the economic burden of tariffs now held unlawful. Binding precedent, read together with the customs statutes and the Tucker Act, shows that the answer is yes.

12

The Government's Motion to Dismiss rests on two principal arguments. First, it contends that because the CIT "possesses exclusive jurisdiction over tariffs," this Court lacks jurisdiction. Mot. at 9. Second, it argues that, even if jurisdiction exists, Plaintiff has not plausibly alleged an illegal exaction. Mot. at 12. Neither contention withstands scrutiny.

On jurisdiction, the Government's theory would channel any litigation connected to tariffs to the CIT, regardless of whether the CIT's jurisdictional statute affords plaintiffs any remedial pathway. That theory disregards the Tucker Act's role in filling jurisdictional gaps left by more-specific schemes. On the merits, the law of illegal exactions establishes that where an intermediary serves as a collection conduit for the Government, the claim belongs to the party who bore the economic burden of the exaction—the party whose money is in the Government's pocket—regardless of that party's status under the customs laws. That party also satisfies Article III's injury-in-fact and traceability requirements, for the reason developed below: whatever else illegal exaction requires, the pass-through here was dictated by the Government's design, not an independent choice by the importer. For both reasons, the motion to dismiss should be denied.

## I.  Legal Standard

The Tucker Act "vests this Court with jurisdiction over any suit against the United States for money damages …." *Polinski v. United States*, 178 Fed. Cl. 736, 740 (2025) ("*Polinski*"); *RadioShack Corp. v. United States*, 566 F.3d 1358, 1360 (Fed. Cir. 2009) (citing 28 U.S.C. § 1491(a)(1)).

On a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), this Court must accept "as true all uncontroverted factual allegations in the complaint, and construe[] them in the light most favorable to the plaintiff." *Estes Exp. Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014). Although plaintiffs bear the burden of establishing subject matter

13

jurisdiction, they need only carry it by a preponderance of the evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

On a motion to dismiss for failure to state a claim under RCFC 12(b)(6), courts examine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Polinski*, 178 Fed. Cl. at 740–41 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). At this stage, the Court must "accept as true the complaint's well-pled factual allegations." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380 (Fed. Cir. 2019). And courts "must consider the complaint in its entirety," as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## II.  Plaintiff pleads facts establishing Tucker Act jurisdiction.

The Tucker Act confers jurisdiction over any non-tort claim against the United States founded upon the Constitution, a statute, or an executive regulation. 28 U.S.C. § 1491(a)(1). "Illegal exaction" claims are a distinct, well-settled branch of that jurisdiction. An illegal exaction occurs whenever the government holds money "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967) ("*Eastport*").

To establish jurisdiction, a party seeking the return of money need only make a "non-frivolous allegation" that "the government, in obtaining the money, has violated the Constitution, a statute, or a regulation." *Boeing Co. v. United States*, 968 F.3d 1371, 1383 (Fed. Cir. 2020) ("*Boeing*"). The claim has two elements: the plaintiff paid money to the government,

and the government, in obtaining it, violated the Constitution, a statute, or a regulation. *Id.*; *Eastport*, 372 F.2d at 1007.

The Government argues that Section 1491(c) bars this Court from exercising Tucker Act jurisdiction over Plaintiff's claim and that, even if jurisdiction attaches, Plaintiff does not plausibly allege an illegal exaction. Neither argument withstands scrutiny.

First, as a threshold matter, Section 1491(c) does not divest this Court of jurisdiction over Plaintiff's claim. Second, Plaintiff amply pleads each element of an illegal exaction. As described in the Complaint, Plaintiff and the proposed Class paid discrete, IEEPA-denominated charges on specific shipments to third-party collection conduits; the intermediaries remitted those amounts to CBP, dollar for dollar, to satisfy a Government obligation; the imposition of the Government obligation was determined by the Supreme Court to be unlawful; and the exacted funds remain with the United States Treasury. Compl. ¶¶ 13, 26–30. The exaction was unlawful because the Supreme Court held IEEPA tariffs invalid in *Learning Resources*. Taken as true, these allegations establish jurisdiction. *Boeing*, 968 F.3d at 1383.

## A. Section 1491(c) does not displace Tucker Act jurisdiction over Plaintiff's illegal-exaction claim.

The Government argues that 28 U.S.C. § 1491(c) requires that Plaintiff's illegal exaction claim be brought before the CIT. Mot. at 9–13. But Section 1491(c) withdraws this Court's jurisdiction only over claims "within the exclusive jurisdiction of the Court of International Trade." 28 U.S.C. § 1491(c). A claim that the CIT's jurisdictional statute does not reach cannot possibly be within the CIT's "exclusive jurisdiction." As such, Section 1491(c) does not channel such a claim to the CIT. *See Trayco, Inc. v. United States*, 994 F.2d 832 (Fed. Cir. 1993) ("*Trayco*") (recognizing a gap in the CIT's exclusive jurisdiction for an importer's action to recover an improperly assessed penalty under 19 U.S.C. § 1592). Plaintiff's claim is one such claim that is

15

not reached by the CIT's jurisdictional statute, and it is therefore properly before this Court under the Tucker Act.

**B. The CIT's jurisdictional statute and related customs statutes do not authorize any remedy for Plaintiff's claim.**

Under 28 U.S.C. § 1581(a), the CIT retains exclusive authority to review the "denial of a protest . . . under section 515 of the Tariff Act of 1930." A party may obtain such review only if it first files an administrative protest, as required by 19 U.S.C. § 1514, and litigates that protest to the point of a "denial." *Hartford Fire Ins. Co. v. United States*, 544 F.3d 1289, 1291 (Fed. Cir. 2008) ("*Hartford*") ("In subsection 1581(a), Congress set out an express scheme for administrative and judicial review of Customs' actions."). Jurisdiction in the CIT under 28 U.S.C. § 1581(a) thus depends upon the exercise and exhaustion of the protest remedies set forth in 19 U.S.C. § 1514.

The decisions that are subject to protest are also confined to seven specifically enumerated categories under 19 U.S.C. § 1514(a): the appraised value of merchandise; the classification, rate, and amount of duties; charges or exactions within the Secretary's jurisdiction; exclusion of merchandise from entry or delivery; liquidation or reliquidation of an entry; refusal to pay a drawback claim; and refusal to reliquidate. *See* 19 U.S.C. § 1514(a)(1)–(7). Each of these categories assumes an administrative agency action, taken by CBP, on a particular entry filed by a particular importer. Therefore, under this protest framework, the party ultimately invoking the CIT's jurisdiction has already filed an entry and directly contended with CBP's administrative decisionmaking apparatus.

Unsurprisingly, therefore, only a select group of parties may exercise the right to protest. Under 19 U.S.C. § 1514(c)(2), only the importer of record, consignee or agent shown on the entry papers, a surety on the bond, or, as relevant here, a person "paying any charge or exaction" may protest. That group may not be broadened: "Section 1581(a) provides no jurisdiction for protests

16

outside [the Section 1514(c)(2)] exclusive categories." *Mitsubishi Elecs. Am., Inc. v. United States*, 44 F.3d 973, 976 (Fed. Cir. 1994). The CIT has reminded that the right to protest CBP's decisions, and consequently the eligibility to invoke CIT jurisdiction, is "purely the creature of statute." *S. African Marine Corp. v. United States*, 640 F. Supp. 247, 251 (Ct. Int'l Trade 1986) (*SAMC*). And while 28 U.S.C. § 1581(i) provides a residual grant of jurisdiction within the CIT, the Federal Circuit has long held that this provision "may not be invoked if jurisdiction under *another* subsection of § 1581 is or could have been available…unless [that] subsection is manifestly inadequate." *Hartford*, 544 F.3d at 1292; *Rimco Inc. v. United States*, 98 F.4th 1046, 1051–52 (Fed. Cir. 2024); *Juancheng Kangtai Chem. Co. v. United States*, 932 F.3d 1321, 1327–29 (Fed. Cir. 2019).

In sum, the CIT's jurisdiction is crafted in a manner to prevent importers from circumventing the administrative protest process built by Congress. Its jurisdiction is available only to those claimants expressly contemplated in the statutory scheme. *See SAMC*, 640 F. Supp. at 250 (party not involved in the entry or import process paid no "charge[] or exaction[]" within § 1514(a)(3) and had no statutory right to sue in the CIT).

Against this backdrop, the "precise remedial scheme" that Congress built for the CIT has no place for Plaintiff and the proposed Class. *See* Mot. at 10 (citing *United States v. Bormes*, 568 U.S. 6, 13 (2012)). Plaintiff and proposed Class members did not file any entry with CBP; they are not importers of record, sureties, or consignees; and, most importantly, they paid no charge *directly* to CBP. Compl. ¶¶ 26–30; *see* 19 U.S.C. § 1514(c)(2). Because Plaintiff and the proposed Class paid an intermediary, acting as the Government's collection conduit, there is no CBP decision addressed to them, no entry of theirs was subject to liquidation, and therefore they have no statutory entitlement to protest or litigate in the CIT. *SAMC*, 640 F. Supp. at 250.

The Government fails to discuss the details of the statutory framework underpinning CIT jurisdiction. As explained above, the CIT does not authorize any path by which Plaintiff and the proposed Class could bring a claim on their factual circumstances.

**C. The absence of a CIT remedy creates a jurisdictional gap that, under *Trayco*, the Tucker Act must fill.**

The Government argues that the CIT possesses exclusive jurisdiction over Plaintiff's claim—but as explained above, the CIT does not offer Plaintiff and the proposed Class a forum to assert their claims. In circumstances such as these, the Tucker Act's function is to fill the jurisdictional gap and provide a remedial forum for plaintiffs.

In *Trayco*, the Federal Circuit recognized that the Court of International Trade "cannot exercise jurisdiction over actions not addressed by a specific jurisdictional grant." 994 F.2d at 836. In that case, the plaintiff was an importer that had paid a civil penalty under 19 U.S.C. § 1592 and sued in district court to recover it. *Id.* at 837–38. The government argued the suit belonged exclusively in the CIT. *Id.* at 838. The Federal Circuit disagreed. Because the CIT's jurisdictional statute did not specifically reach the importer's suit to recover an unlawful penalty, "a gap" existed in the CIT's exclusive jurisdiction; the corollary was that the Tucker Act would fill the gap and supply the forum. *Id.* at 836–37. Critically, the Federal Circuit's holding depended upon the CIT's jurisdictional statute—specifically, that Congress had not created any specific jurisdictional grant that covered the plaintiff's claim—and not on the nature of the plaintiff's claim, or the nature of the money that was claimed.

*Trayco*'s holding is the logical conclusion that follows from the Supreme Court's instruction that Congress did not commit to the CIT "every suit against the Government challenging customs-related laws and regulations," but instead "delineat[ed] precisely" the matters reserved to that court. *K-mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 188 (1988). Accordingly, if the

18

Government's argument is accepted, and 28 U.S.C. § 1491(c) bars this Court's jurisdiction over Plaintiff's claim, then a remedial vacuum exists that Congress could not have intended. *BP Am. Prod. Co. v. United States*, 142 Fed. Cl. 446, 453 (2019) ("To displace the Tucker Act, a remedial scheme must provide a plaintiff with an 'opportunity for full relief' on its claims."); *Dinh v. United States*, 145 F.4th 1316, 1323 (Fed. Cir. 2025) ("When the Tucker Act is capable of co-existence with another statute, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to reward each as effective.") (cleaned up).

Two settled principles forbid such a remedial vacuum. First, an unlawful exaction implies a monetary remedy because "absent a prompt restoration of money unlawfully exacted," the protection against the exaction "would be more hollow than real." *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1374 (Fed. Cir. 2000) (arising under the Export Clause). This Court has explained that without a monetary remedy, a party alleging an illegal exaction "has no recourse" to recover money that the Government unlawfully took. *Wagstaff v. United States*, 105 Fed. Cl. 99, 112 (2012). It follows, therefore, that a forum must be provided for a plaintiff to seek the "recourse" of a monetary remedy.

Second, courts generally apply a presumption against foreclosing judicial review. The Supreme Court distinguishes statutes that merely channel review to a particular court, which trigger a modest presumption, from those that would "eliminate judicial review," which trigger a strong one. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 156–57 n.4 (2025). A plaintiff who could not access *any* court by operation of a statutory interpretation benefits from this strong presumption. Here, the Government's reading does not simply channel judicial review of Plaintiff's and the proposed Class's claims; the Government's reading in fact *eliminates* such review altogether. Under *Trayco*, the statutory construction that avoids a

19

jurisdictional vacuum is what this Court should adopt. The CIT cannot hear a claim that is not subject to a specific jurisdictional grant, so 28 U.S.C. § 1491(c) does not bar such a claim before this Court.

### D. The Government's authorities do not support its channeling theory.

The Government's channeling theory principally relies on *Forest Products Northwest, Inc. v. United States*, 453 F.3d 1355 (Fed. Cir. 2006) ("*Forest Products*") and *United States v. Bormes*, 568 U.S. 6 (2012) ("*Bormes*"). Mot. at 10–12. Neither decision supports such a theory. The decision in *Forest Products* in fact confirms Plaintiff's argument that the Tucker Act must fill a jurisdictional gap such as the one described above.

In *Forest Products*, the plaintiff was an importer of record that brought two shipments of Canadian lumber into the United States, filed the entries with CBP, and deposited money in satisfaction of duties "under protest." 453 F.3d at 1357. It sued in the Court of Federal Claims on three theories: misclassification, violation of the Customs Modernization Act, and error in applying the duty orders. *Id.* Each theory challenged *how* CBP treated the plaintiff's own entries. The Court of Federal Claims dismissed the case for lack of jurisdiction, and the Federal Circuit affirmed. *Id.* at 1357–58, 1361. The dismissal rested on two features that are noticeably absent here. First, the plaintiff was an importer with an unexhausted path to the CIT. *Id.* at 1359 (finding that plaintiff could seek review of a denial of protest and that Sections 515 and 516A of the Tariff Act "would provide" a "substantive right to money damages" and "exclusive jurisdiction over cases filed under these statutory provisions is vested in the Court of International Trade."). Second, the court found that the plaintiff's other bases for a claim also fell within the CIT's exclusive jurisdiction, because the plaintiff was ultimately contesting duties imposed on its own entries. *Id.* at 1360–61.

20

Here, unlike in *Forest Products*, the jurisdictional outcome does not turn on whether Plaintiff's claim "arises out of" the tariff laws. *Id.* at 1360. Even assuming that it does, 19 U.S.C. § 1581(i) confers *jurisdiction*, not a remedy—the *Forest Products* court routed the plaintiff's claim to the CIT, because that court afforded the plaintiff a pathway to relief. In contrast, Plaintiff and the proposed Class here do not have such a pathway, nor do the relevant customs statutes accommodate them. *See supra* Section II.B. Moreover, in *Forest Products*, the CIT had jurisdiction because the plaintiff challenged its own entries, *id.* at 1360, unlike here, where Plaintiff and the proposed Class do not have any CBP entries to challenge.

The Government suggests that *Forest Products* categorizes *Trayco*'s jurisdictional gap-filling analysis based on the type of money paid to the Government, rather than the plaintiff's ability to access a forum.[3] But an importer, unlike Plaintiff here, always has a remedial pathway in the CIT, because it must contest a duty under 19 U.S.C. § 1581—irrespective of the nature of the money paid. Accordingly, *Trayco*'s governing principle remains applicable: the CIT's exclusive jurisdiction reaches only what Congress placed within a specific grant. *See supra* Section II.B.; *see Forest Products,* 453 F.3d at 1361 (noting that importer plaintiff "ha[d] not alleged that an illegal exaction ha[d] taken place, but [was] seeking a refund of antidumping and countervailing duties.").

In fact, this class action does not call on this Court to adjudicate any issue of tariff law at all. The CIT was established by Congress to create one court having the "specialized expertise" needed to provide "a comprehensive system of judicial review of civil actions arising from import transactions." H.R. Rep. 96-1235, 20 (1980), reprinted in 1980 U.S.C.C.A.N. 3729, 3731. Those

---

[3] The court did distinguish *Trayco* partly on that ground. *Id.* at 1360–61. But the claimant before it was an importer, for whom the charge type and pathway availability coincide.

are actions "primarily challenging classification and valuation determinations." *Id.*, at 19, 1980 U.S.C.C.A.N. at 3730–31. Thanks to the Supreme Court's decision in *Learning Resources*, no such determinations are implicated here; that the tariff at issue was illegal is a given. All that remains for this Court to determine are the sums certain to be refunded to Plaintiff and the proposed Class, an undertaking comfortably within this Court's longstanding jurisdiction over illegal exactions.

The Government's reliance on *Bormes* is equally misplaced. There, an attorney who paid a client's filing fee online sued the United States under the Fair Credit Reporting Act ("FCRA"), alleging that his electronic receipt displayed too many digits of his credit-card number. 568 U.S. at 8–9. He sought damages under the FCRA and the "little" Tucker Act. *Id.* at 9. The Supreme Court held that the plaintiff could not "mix and match FCRA's provisions with the Little Tucker Act's immunity waiver." *Id.* at 15. Because the FCRA "contains its own self-executing remedial scheme"—a "carefully circumscribed, time-limited, plaintiff-specific" cause of action that "precisely define[s] the appropriate forum"—that statute, not the Tucker Act, determined the Government's liability. *Id.* at 11–15.

*Bormes* articulates an uncontroversial rule: the Tucker Act yields "when a law assertedly imposing monetary liability on the United States contains its own judicial remedies." *Id.* at 12. But if the underlying statute contains no remedy for the plaintiff at all, *Bormes* does not compel the withdrawal of Tucker Act jurisdiction. Accordingly, here the customs laws may very well prescribe a "precise remedial scheme," Mot. at 10, but that scheme exists only for importers. For Plaintiff, this scheme cannot "establish[] the exclusive framework" for a liability to a party that it never addresses. *Bormes*, 568 U.S. at 12. Therefore, the Government's reliance on *Bormes* does not support its argument that Section 1491(c) operates as a jurisdictional bar.

The decision in *Nichols v. United States*, 74 U.S. 122 (1869), underscores this point. *Nichols* held that an importer could not sue in the Court of Claims for duties already paid, because the importer could protest, and therefore "[t]he revenue laws already provided a remedy." *Bormes*, 568 U.S. at 13. According to the *Nichols* court, the Tucker Act was "confined to a gap-filling role" precisely because a special remedy existed for that importer. *Id.* The general Tucker Act remedy would become available "only [if] [n]o special remedy has been provided" for the claimant. *Id.* (quoting *United States v. Kaufman*, 96 U.S. 567, 569 (1878)). Here, an importer of record enjoys a special remedy, and so the Tucker Act necessarily yields; but for Plaintiff and the proposed Class, no such special remedy awaits, and thus the Tucker Act must fulfill its gap-filling role.

Finally, the Supreme Court's decision in *Learning Resources* does not compel a different result. There, the Court agreed that the *V.O.S. Selections* plaintiffs fell within the CIT's exclusive jurisdiction, because their challenges "[arose] out of" modifications to the Harmonized Tariff Schedule of the United States ("HTSUS"). 607 U.S. at 239 n.1. The Government emphasizes a footnote in that opinion, but that footnote concerned the CIT's jurisdiction, not a plaintiff's entitlement to relief once before that court.[4] Moreover, the footnote assumed a plaintiff challenging a tariff modification, not an illegal exaction. Accordingly, the *Learning Resources* Court's dictum does little more than mark where importers challenging tariffs belong; it does not compel the path that Plaintiff must take to vindicate its illegal exaction claim (even if the exaction was made to pay an unlawful tariff).

---

[4] Even if footnote 1 in *Learning Resources* establishes that any challenge germane to a tariff must fall within 19 U.S.C. § 1581(i), that does not resolve whether Plaintiff and proposed class members may obtain relief in the CIT. As discussed above, they cannot.

### III. The Complaint plausibly alleges both standing under Article III of the United States Constitution and an illegal exaction.

The Government also argues that, even if jurisdiction exists: (a) Plaintiff lacks standing under Article III because it has not suffered a concrete, particularized, and actual or imminent injury traceable to the Government's requirement that importers of record pay IEEPA tariffs, Mot. at 12–13; and (b) Plaintiff was not subject to any illegal exaction, as defined below, because it has not alleged that it paid money to a third party at the Government's direction to satisfy a Government obligation, *id*. at 14–16. Each argument is addressed below.

#### A. Plaintiff has adequately alleged Article III standing.

The Government argues that the Class lacks Article III standing because intermediaries chose to pass the duties through, which, according to the Government, is a purported independent act that breaks the causal chain between the Government's conduct and the Class's loss. Mot. at 12–13 (citing *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) ("*Murthy*")). The argument founders on both the facts and the governing standard. The Government makes the same argument, on the same facts, that it makes against the illegal-exaction claim below—that the pass-through was an independent business decision rather than a product of the Government's design. *See infra* Section III.B.2. It fails here for the same reason: the pass-through was dictated by the Government, not any independent choice by the importer.

To establish Article III standing, a plaintiff must show: (i) a concrete, particularized injury in fact; (ii) a causal nexus between the injury and the conduct complained of; and (iii) judicial redressability. *Lujan*, 504 U.S. at 560–61. The Supreme Court made clear in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), that proof of concrete harm, not a bare statutory right or obligation, is required to establish Article III injury: "Congress may enact legal prohibitions and obligations. And [it] may create causes of action for plaintiffs to sue…. But under Article III, an injury in law

24

is not an injury in fact." *Id.* at 426–27. Thus, "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation" have standing to sue in federal court. *Id.* at 427.

First, Plaintiff establishes the standard pocketbook injury that satisfies the injury-in-fact prong. *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 111 (2025) ("Monetary costs are of course an injury.") (quoting *United States v. Texas*, 599 U.S. 670, 676 (2023)). Plaintiff paid a specific, documented, IEEPA-denominated charge on a commercial invoice. That sum now sits in the Treasury. Compl. ¶¶ 26–30. A discrete, identifiable sum wrongfully taken from an identifiable person is the paradigmatic concrete, particularized injury.

Second, Plaintiff establishes redressability: the remedy for an illegal exaction is return of the money unlawfully exacted, and 28 U.S.C. § 1491(a)(1) supplies the manner by which Plaintiff's injury can be redressed. *Management and Training Corp. v. United States*, 115 Fed. Cl. 26, 35 (2014) (noting that redressability under the Tucker Act is "foregone" because the Act confers the power to "award any relief that the court considers proper" under 28 U.S.C. § 1491(b)(2)) (internal quotations omitted).

Third, Plaintiff's injury is traceable to the Government's conduct. A third party's act breaks the causal chain only when it is genuinely independent of the Government's conduct. Here it was not, for the reasons given below: the Government made the importer of record liable for a non-dischargeable duty the importer could not absorb, so the pass-through was the chain working as designed, not an independent business decision. *See infra* Section III.B.2. An injury is traceable where the Government's action would predictably cause a third party to inflict it. *See Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019) (holding traceability element of standing satisfied where plaintiff alleges that his injury was "the predictable effect of Government action on the decisions of third parties"). That distinguishes the Government's principal authority. *Murthy*

involved platforms exercising editorial judgment over their own content—no charge assessed, and no money to the Treasury. 603 U.S. at 57–60. The conduits exercised no such discretion over the Class's money; they billed the exact duty, by rote, and remitted it. Who may pursue a customs refund does not answer who was injured. Statutory eligibility to protest at the CIT and Article III injury are different questions.

### B. The Complaint plausibly alleges an illegal exaction.

An illegal exaction claim has two elements: the plaintiff paid money to the Government, and the Government took it in contravention of the Constitution, a statute, or a regulation. *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996) ("*Aerolineas*") (quoting *Eastport*, 372 F.2d 1007-08).

The second element is not in dispute. The Supreme Court held that IEEPA conferred no power to impose the tariffs in question. *Learning Resources*, 607 U.S. 229. Plaintiff and proposed Class members paid those tariffs in satisfaction of a demand that the statute did not authorize, and so their money was taken in contravention of law. The Government does not contend otherwise.

The only dispute is as to the first element: whether Plaintiff and the proposed Class actually paid money to the Government. On the facts alleged in the complaint, they did. Illegal exaction jurisprudence does not demand that a plaintiff establish the direct transfer of money to the Government, hand-to-hand, over the counter. Rather, what matters is whether the Government ultimately "has the citizen's money in its pocket" (*Clapp v. United States*, 127 Ct. Cl. 505, 512, *cert. denied*, 348 U.S. 834 (1954) ("*Clapp*")). This conclusion can follow whether the plaintiff paid the government directly or "in effect." *Camellia Apartments, Inc. v. United States*, 167 Ct. Cl. 224 (1964), *cert. denied*, 379 U.S. 963 (1965).

Here, Plaintiff plausibly alleges that it and proposed Class members paid money to the Government, "in effect," for three reasons: (1) importers of record acted as collection conduits for the Government; (2) the importers' pass-through was compelled by the Government's design, not an independent business decision; and (3) the tariffed payors, not the importers, are the real parties in interest and the only ones positioned to vindicate the wrong.

### 1. *Importers of record act as collection conduits for the Government.*

Under the law of illegal exactions, an "in effect" payment implies an intermediary—a conduit that moves the money from the payor to the Government. Accordingly, the mere existence of an intermediary between Plaintiff and the Government cannot defeat an illegal exaction claim.

This Court's decision in *Aerolineas* is instructive on this point. In that case, the government ordered certain airlines to detain and house excludable passengers pending removal, and, in partial fulfilment of that obligation, the airlines paid the hotels and caterers who housed the passengers subject to removal. 77 F.3d at 1568. The Federal Circuit held that the money expended by the airlines was illegally exacted even though not a dollar passed directly from the airlines to the government, because the airlines had paid third parties "at the direction of the government to meet a governmental obligation." *Id.* at 1573. This Court reached the same conclusion in *Virgin Islands Port Auth. v. United States*, 136 Fed. Cl. 7 (2018), *aff'd on other grounds*, 922 F.3d 1328 (Fed. Cir. 2019) ("*Virgin Islands*"). In that case, CBP collected tonnage and wharfage fees that the Virgin Islands port authority believed only it had authority to collect; the court deemed the payments made by port users to CBP as payments "in effect," in satisfaction of a plausible illegal exaction claim, because CBP had "stepped in between port users and plaintiff and redirected payment to itself." *Id.* at 14. Notably, the Federal Circuit, affirming on different grounds, explained that the nature of the payment—"in effect" or otherwise—was a "merits issue, not a jurisdictional one."

27

*Virgin Islands*, 922 F.3d at 1333–34. And when it has served the Government's own interests, the Government has adopted the same position: only a year ago it described Southwest Airlines as a "collection agent for the Government," obligated to charge its customers and remit the fees to the United States. *Sw. Airlines Co. v. United States*, 777 F. Supp. 3d 1318, 1329 (Ct. Int'l Trade 2025).

### 2. *The importers' pass-through was compelled by the Government's design, not an independent business decision.*

The Government's argument against illegal exaction is reducible to a single point: the United States never *required* importers of record to collect anything from Plaintiff and proposed Class members, and so the duties Plaintiff and proposed Class members paid satisfied nothing more than importers' "business decision[s]" to pass a cost downstream. Mot. at 14–16. This argument fails because it misinterprets the importers' pass-through conduct. Far from acting independently, importers were faced with a non-dischargeable federal debt that would be economically impossible to absorb, meaning they had no choice but to collect the duty from the parties whose goods bore it. What the Government characterizes as independent decision-making was in fact the predictable outcome of a coercive governmental design.

The coercive nature of an applicable Government framework is a critical factor in favor of an illegal exaction. This Court has recognized that government conduct can carry a "coercive quality" sufficient to support an illegal exaction even without a direct command, where the Government's design leaves the intermediary no meaningful alternative. *Fireman v. United States*, 44 Fed. Cl. 528, 536 (1999) *("Fireman"); see Virgin Islands*, 922 F.3d at 1336. The IEEPA tariff regime has the same coercive quality. CBP regulations require that the IEEPA duty attach upon import and specify that tariffs are "a personal debt due from the importer to the United States," dischargeable "only by payment in full." *See* 19 C.F.R. § 141.1(a), (b)(1). The importer of record owes this debt to the Government, and it cannot discharge that debt by paying an intermediary.

28

The Government, through CBP, has therefore fixed the terminus of the chain, so that the duty will reach the Treasury, paid by the importer of record, on pain of a non-dischargeable federal debt.

Moreover, the sheer magnitude of the duties economically compels importers to assume the role of a collection conduit. The Government unlawfully collected more than $170 billion in IEEPA tariffs, Compl. ¶ 41, more than any importer could absorb without going out of business. An importer made liable by regulation for a colossal debt has only one option: collect the duty from the party whose goods bore it. In this light, importers of record did not make an independent business judgment; they predictably took the only course of action available—to pass IEEPA duties on to Plaintiff and proposed Class members. It was the Government's design, not the importers' choice, that exacted payments from Plaintiff.

By their own account, importers confirm that they behaved as the Government's collection conduit, which, at a minimum, raises a fact issue ill-suited for resolution on a motion to dismiss. *Lesko v. United States*, 166 F.4th 967, 971 (Fed. Cir. 2026). The Government insists that importers "made the business decision" to pass the duties along "to make up for lost revenue." Mot. at 15–16. The allegations of the Complaint, which must be taken as true at this stage, contradict this assertion: FedEx publicly explains that, "[a]s a transportation provider and customs broker, FedEx is *required* to assess and *collect* duties and taxes in accordance with current customs regulations and government directives at the time of import." Compl. ¶ 28 (emphases added). Accordingly, contrary to the Government's assertion that Plaintiff cannot identify an instance of "Government direction," the Complaint sufficiently alleges that importers of record collected payments from Plaintiff confident that they were making such collections to satisfy the Government's demand.

Indeed, if the Government is correct that importers of record made independent business decisions, then the importers might have raised their general rates to offset a new cost. Instead,

importers billed the exact duty, to the dollar, as a separate IEEPA line item on each shipment, and some, such as DHL, withheld the goods until the customer paid it. Compl. ¶¶ 29–30. This conduct supports a reasonable inference that importers were not making independent business decisions to set the price of their own services, but instead were passing through a charge they could neither legally alter nor economically bear and remain solvent. Plaintiff's money moved, singularly, from Plaintiff and Class members' pockets to CBP, and then into the Treasury. *Clapp,* 127 Ct. Cl. at 512.

The Government attempts to distinguish *Aerolineas* but misreads that case. *Aerolineas* does not confine illegal exaction claims to situations where the Government has obtained payment from a third party and unlawfully compels the plaintiff to pay. Rather, *Aerolineas* merely reaffirms a longstanding rule that an exaction occurs when a plaintiff's money is "improperly paid, exacted, or taken," "to others at the direction of the government to meet a governmental obligation," and the government "has the citizen's money in its pocket." *Aerolineas*, 77 F.3d at 1572–73 (cleaned up). In *Aerolineas*, the Governmental obligation at issue was Congress's requirement that the Immigration and Naturalization Service bear the costs of housing excludable passengers; the agency demanded that airlines pay those costs instead. *Id.* at 1568–71. The Federal Circuit ruled that the airlines' payments to hotels and caterers was money paid "in effect" to the United States because the government's regulatory framework compelled the airlines to satisfy a burden that the statute placed on another entity. *Id.* at 1573, 1578.

The same structure is present here. Plaintiff alleges that CBP required importers of record to deposit IEEPA duties as part of the tariff framework, and that these tariffs "were required to be paid in connection with" Plaintiff and the proposed Class's import transactions. Compl. ¶¶ 25-26; Mot. at 20 (acknowledging importer liability under 19 C.F.R. § 141.1(b)(1)). Facing a personal,

30

non-dischargeable debt for unlawful duties, importers then passed the charges through to Plaintiff and the Class as separate IEEPA-denominated line items, and remitted the same amounts to CBP. Compl. ¶¶ 27–30.

The Government suggests that an illegal exaction requires coercion of the party seeking the money back, but that argument finds no support in the law. *Fireman*, 44 Fed. Cl. at 536; *Virgin Islands*, 922 F.3d at 1336–37 ("[c]oercion of the claimant is of course not typically an element of an illegal exaction claim"). What is required is a determination of whose money the government holds, not how the government came to hold it.

### 3. *The tariffed payors, not the importers, are the real parties in interest and the only ones positioned to vindicate the wrong.*

This Court's jurisdiction over Plaintiff's and the proposed Class's claims is further supported by equitable considerations. In *Fireman*, the court explained that the illegal exaction doctrine must not be narrowly construed after *Aerolineas* and articulated four reasons for a broad interpretation that reaches payments made without government coercion. 44 Fed. Cl. at 537. The fourth reason is that "as a matter of policy," the plaintiffs were "entitled to their day in court." *Id.* Illegal exaction claims "present challenging fact patterns," the court acknowledged, but if the parties "whose illegal contributions are not returned to them cannot challenge" the government's conduct, "then who will challenge [it]?" *Id.*

This principle is straightforward: where no other forum and no other party will take up the claim, this Court should let the plaintiff vindicate it. The Court of Claims has confirmed this principle, noting that "compelling equities of [] situations in which the Government admittedly has the citizen's money and seeks to keep it…justify [] requiring the Government to disgorge what it has no right to retain." *Pan American World Airways v. United States*, 122 F. Supp. 682, 683 (Ct. Cl. 1954).

31

This equitable principle applies here: Plaintiff and proposed Class members cannot litigate their claims in another forum, including the CIT. *See supra* Section II.B. If the Government's position were adopted, hundreds of thousands of tariffed payors would be left with a pocketbook injury, their money in plain view at the Treasury, but with no forum to seek its recovery. Nor would any other actor press Plaintiff's and the proposed Class's claims. The only other actors in the chain are the importers of record, who are pursuing their own refunds in the CIT and who, already made whole for the portion of IEEPA duties that they passed through to Plaintiff and the proposed Class, have no reason to seek the return of that money and no duty to pass it back.

In this light, the Government's "double recovery" concern is misplaced. Mot. at 16. If any party risks a windfall, it is the importer of record that (1) has already made itself whole by passing IEEPA duties through, dollar for dollar, as separate line items on customer invoices, and (2) now stands to receive CAPE or CIT-ordered refunds of those same duties. Importers who have fully shifted the economic burden to downstream payors have no cognizable injury-in-fact from the unlawful tariffs, yet the current refund infrastructure allows them to obtain a second recovery on top of the money that they already collected from Plaintiff and the proposed Class. By contrast, permitting Plaintiff and the Class to recover IEEPA tariff amounts they actually paid is the only way to ensure that unlawfully collected duties are returned to the parties that bore the loss, rather than unjustly enriching intermediaries.

## **CONCLUSION**

The Supreme Court has already decided that the IEEPA tariffs were unlawful. All that remains for this Court is to oversee the return of that illegally exacted money to the Class of people who actually paid it. Doing so would not require this Court to weigh in on the legality of the tariffs at all—only to finish what the Supreme Court has already started. On the Government's telling,

the tariffed payors who bore that exaction have nowhere to turn: not to the Court of International Trade, which affords them no remedial pathway, nor to the Government's own refunds process, which was not built to accommodate them. That result would leave hundreds of thousands of payors on one side of a jurisdictional gap of the Government's own making, their money on the other, with no bridge available to close it. The Tucker Act exists precisely to close that gap. The motion to dismiss should be denied.

Dated: July 13, 2026

/s/ Robert J. Cynkar
Robert J. Cynkar
**McSweeney, Cynkar & Kachouroff PLLC**
3126 Elmendorf Drive
Oakton, VA 22124
Tel: (703) 621-3300
rcynkar@mck-lawyers.com

Scott A. Martin (admitted *pro hac vice*)
Kartik S. Madiraju (admitted *pro hac vice*)
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, New York 10004
Tel: (646) 357-1100
smartin@hausfeld.com
kmadiraju@hausfeld.com

Michael D. Hausfeld (admitted *pro hac vice*)
John Thompson (admitted *pro hac vice*)
**HAUSFELD LLP**
1200 17th Street N.W., Suite 600
Washington, DC 20036
Tel: (202) 540-7200
mhausfeld@hausfeld.com
jthompson@hausfeld.com

Michael P. Lehmann (admitted *pro hac vice*)
**HAUSFELD LLP**
580 California Street, 12th Floor
San Francisco, California 94104
Tel: (415) 633-1908
mlehmann@hausfeld.com

33

Justin S. Nematzadeh (admitted *pro hac vice*)
**NEMATZADEH PLLC**
1129 Northern Boulevard, Suite 457
Manhasset, NY, 11030
Tel: (646) 799-6729
jsn@nematlawyers.com

John W. ("Don") Barrett
Katherine B. Riley (*pro hac vice forthcoming*)
Sterling Aldridge (*pro hac vice forthcoming*)
**BARRETT LAW GROUP, P.A.**
404 Court Square North
P.O. Box: 927
Lexington, MS 39095
Tel: (662) 834-2488
dbarrett@barrettlawgroup.com
kbriley@barrettlawgroup.com
saldridge@barrettlawgroup.com

Gordon Ball (*pro hac vice forthcoming*)
**GORDON BALL PLLC**
322 31st Avenue N #113
Nashville, TN 37203
Tel: (865) 525-7028
gball@gordonball.com

Charles J. LaDuca (*pro hac vice forthcoming*)
Charles Barrett (admitted *pro hac vice*)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
2445 M Street NW, Suite 740
Washington, DC 20037
Tel: (202) 789-3960
charlesl@cuneolaw.com
cbarrett@cuneolaw.com

***Counsel for Plaintiff and Proposed Class***

34